In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-25-00439-CV**

_____

**IN THE INTEREST OF I.S.**

**On Appeal from County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 24-10-16977**

**MEMORANDUM OPINION**

This appeal arises from a judgment terminating Mother's and Father's (collectively "the Parents") parent-child relationship with their daughter, Ivy, following a jury's affirmative findings on predicate grounds D, E, and N, and best interest.[1] The jury found, by clear and convincing evidence, statutory grounds exist for termination of Mother's and Father's parental rights and that termination of their parental rights would be in Ivy's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (2). The trial court signed an Order of Termination of

_____

[1]To protect the child's identity, we use a pseudonym to refer to the child and the parents. *See* Tex. R. App. P. 9.8(b)(2).

1

the Parents' rights based on the jury's findings. Both Mother and Father challenge the legal and factual sufficiency of the evidence supporting the predicate grounds and best interest finding. Mother also challenges the appointment of the Department of Family and Protective Services ("the Department") as Ivy's managing conservator and the trial court's denial of a motion for mistrial.

As more fully discussed below, we hold that Father failed to preserve his sufficiency challenges, and we affirm the trial court's Order of Termination as to Father and Mother. We also overrule Mother's challenges to the appointment of the Department as Ivy's managing conservator and the trial court's denial of the motion for mistrial.

**Background**

On October 31, 2024, the Department filed a petition to terminate Mother's and Father's parental rights to Ivy. The Department supported its petition with the affidavit of its investigator, Cherry Haynes ("Haynes"). Haynes's affidavit set out the information leading to Ivy's removal.

According to Haynes's affidavit, on October 29, 2024, the Department received a report of physical abuse to one-month-old Ivy, after she was brought to the hospital with a broken femur and other concerning marks on her body. Haynes states that Mother has "untreated mental health issues[,]" and Father "is autistic." According to Haynes, she met with Mother at the hospital and Mother stated that she

had been diagnosed with bipolar disorder, anxiety and depression. Mother reported that she was not currently medicated and had not been medicated since becoming pregnant with Ivy. According to Haynes, Mother told her while she was in another room she heard Ivy cry in a manner different than normal. Mother stated that she went into the bedroom where Ivy and Father were and noticed that Ivy's leg looked different. Mother indicated that she told Father that they were going to the hospital and that Father did not respond. Mother advised that at the hospital, Father told her that he was changing Ivy when she slipped away from him, and he grabbed her leg to prevent her from hitting the floor. Mother stated that she lived with Father's parents and that Father's dad has mental health issues.

The report reflected that Department Special Investigator Catherine Giannaris met with Father who said that he has autism and suffers from both short- and long-term memory loss. Father stated that Mother went to the kitchen to make Ivy's bottle and that he removed Ivy from her car seat and was holding her in his left arm. Father stated that while grabbing a towel with his right hand, Ivy became fussy and squirmy and slipped out of his arm. Father stated that he grabbed Ivy by her leg with his right hand and thought he heard and felt something snap. Father confirmed that when Mother returned to the room, she noticed that Ivy had a floppy leg.

The report stated that Haynes went to the hospital to see Ivy and saw visible disfigurement of Ivy's leg and scratches on her face. Haynes was informed that Ivy

3

was being transported to Memorial Hermann Medical Center for further evaluation of additional injuries.

The report explained that the next day, October 30, 2024, a special medical team met with the child abuse team at Memorial Hermann Medical Center. Dr. Sheela Lahoti, the primary physician who examined Ivy, advised that Ivy had the following injuries: left femur fracture; left ear bruise; and hepatic laceration. Dr. Lahoti advised that Ivy's injuries were concerning for physical abuse, and the Parents' explanations were inconsistent with Ivy's injuries.

The report confirmed that the Department met with the family to "gain a relevant explanation" regarding how Ivy was injured, and they could not provide one. Haynes confirmed that Ivy was seriously injured, her injuries were consistent with physical abuse, and leaving Ivy in the care of the Parents could cause her more serious harm. At the time, there were no family or fictive kin members who could care for Ivy.

The report stated that the Department asked to be named Ivy's Temporary Managing Conservator to ensure her health and safety. Haynes pointed out that Ivy sustained bruising to her ear, two leg fractures, and a liver laceration and that the Parents could not provide consistent or reasonable explanations for the injuries. Haynes stated that medical staff concluded Ivy's injuries, given her vulnerable age, were consistent with abuse.

4

Trial Evidence

On October 13, 2025, a jury trial on the termination of Mother's and Father's parental rights began.

Haynes testified that after eighteen years as an investigator, she retired from the Department in December 2024. She explained that as an investigator, she would "staff[] the cases with [a] supervisor, make contact with the family, child, ask[] questions, and staff what the findings are with the supervisor." She recalled that she was assigned Ivy's case in October 2024, after allegations of neglectful supervision and physical abuse. Haynes testified that as an investigator, she would first make contact with the family, speak with the reporter, make contact with the child, and speak with the supervisor about the information obtained pertaining to the alleged abuse or neglect then determine the next steps.

Haynes recalled arriving at Memorial Hermann Hospital in The Woodlands around 3 a.m. with CPS Special Investigator, Katherine Giannaris. Haynes explained that a special investigator is involved when there are serious injuries to a child. Haynes testified that she first met with hospital staff, then interviewed Mother. She asked Mother about her job, home environment, relationship with Ivy, daily schedules, and the events of the day. Mother was eighteen or nineteen years old and shared that the Department was involved in her childhood. Mother told Haynes that she lived with Ivy, Father, and Father's parents in his parents' home and that she

5

worked for DoorDash. Haynes testified that Mother said she was diagnosed with bipolar disorder, anxiety, and depression, and although prescribed medicine, she had not been on any medicine since her pregnancy.

Haynes testified that regarding Ivy's injuries, Mother stated that she was in either the bathroom or kitchen cutting avocadoes when she heard Ivy scream. Mother stated that she went into the room and noticed Ivy's leg was "dangling." Haynes did not discuss any of Ivy's other injuries with Mother that night. According to Haynes, Mother stated that she was not in the room when Ivy was injured, and Father was with Ivy. Haynes testified that Mother told her that once they arrived at the hospital, Father said that he almost dropped Ivy and tried to grab her to prevent Ivy from hitting the floor. After speaking with Mother for half an hour to an hour, Haynes then discussed the incident with her supervisor, Mary Nicholas, and Giannaris. At that point, Giannaris took over the investigation. Haynes did not interview Father, but officers and Giannaris did.

Haynes testified that when she saw Ivy, she noted scratches on Ivy's face, a bruise in her ear, and her leg was on a board and taped down. At the end of the investigation, Ivy was removed and placed in foster care. Haynes stated that there was reason to believe neglectful supervision for Mother, and physical abuse and neglectful supervision for Father.

Haynes confirmed that she visited the home where Mother, Father, and Ivy lived with Father's parents, in the Lake Conroe area. Haynes stated that the bedroom was neat but tight with the bed and bassinet where Ivy slept. She stated that the living room had totes stacked from the floor to the ceiling.

Giannaris also testified at trial. She has been a special investigator with the Department for seventeen years. She clarified that a special investigator is a former law enforcement officer that primarily deals with and is assigned to cases of high profile, high media, and serious injury. October 29, 2024, she was assigned to Ivy's case with allegations of physical abuse of a one-month-old. Giannaris received a call about the case around 1 a.m., and she coordinated to meet with the investigator at the hospital. She arrived at Memorial Hermann The Woodlands around 1:30 a.m. and was escorted to Ivy's room. She noted that medical staff were inside the room, but Mother and Father were outside the door. Giannaris testified that she introduced herself to Mother and Father and asked to speak with Father when Mother immediately spoke up and stated that Father is autistic. She then asked to speak with Father again, and once he agreed, she and Father went into a private family room where she read him the notification of rights and asked if he understood. Father stated that he understood but wanted to talk to someone before he spoke with Giannaris. About thirty minutes later, Father returned for his interview with Giannaris.

Giannaris testified that she began by asking Father basic questions like his name, birthdate, social history, criminal history and history with the Department. Father indicated that he was involved with the Department as a child when his mother was beaten by his stepfather. Father said that he had long-term and short-term memory loss, and although he did not currently use drugs, he used Delta-8, mushrooms, Xanax, and marijuana a year earlier. Giannaris stated that they discussed Mother, and Father stated that Mother was diagnosed with bipolar-1 but was not taking her medicine because she had gotten pregnant.

According to Giannaris, Father said he was Ivy's caretaker, but Mother primarily watched Ivy during the day. Giannaris testified that Father claimed that he was holding Ivy in his left arm, and "that she was fussy and squirmy[,]" and fell. He stated that he grabbed her with his right hand and that is when he heard the snap. Father told Giannaris that Mother was in the other room. Giannaris spoke with Father for about forty to forty-five minutes but never went to the residence.

Giannaris explained that she did not interview Mother because Haynes was interviewing her, and at that point, Mother was not considered the perpetrator since Father was with Ivy at the time of her injury. She testified that she spoke with hospital staff briefly and the Conroe Police Department then later spoke with supervisors about the disposition. Giannaris testified the conclusion was "reason to

believe," which meant the evidence showed abuse or neglect occurred. Her role in this case ended once she left the hospital.

Derrick Dunn testified that in October 2024 he was a detective with the Conroe Police Department but has since left the police department. On October 29, 2024, Dunn was the on-call detective who investigates major crimes, so he was called to investigate a report of an injury to a child.

Dunn stated that he met Mother and Father on the day of the incident and met Father first at Memorial Hermann Hospital in The Woodlands. Mother and Ivy were transferred to Memorial Hermann in Houston, so Dunn testified that he later went there to speak with Mother. After speaking with the Parents, Dunn continued his investigation, then later he interviewed Mother and Father again at the police department on November 4, 2024.

Dunn testified that he wore a body camera while working as an on-call detective, which recorded this investigation. A copy of Dunn's body camera video was admitted into evidence and shown to the jury.

Dunn relayed that when he arrived at Memorial Hermann in The Woodlands, he spoke with officers and then Father for about an hour. Dunn also spoke with Mother's father at the hospital before going to Memorial Hermann in Houston. He then spoke with Mother to get her side of the story.

Dunn testified that Mother mentioned Ivy rolling, and this was odd to him because generally at a month old, babies are unable to roll. Dunn explained that Ivy was in the hospital bed in the video and he saw scabs on her face, "a lot of bruises," including to her ear and upper left shoulder area, and her leg injury. After talking with Mother, Dunn spoke with the doctors and nurses to get their thoughts on how Ivy was injured since Mother and Father claimed it was an accident.

Dunn stated that he returned to the room to speak with Mother about Ivy's shoulder injury, and Mother explained that she took Ivy to the hospital a week prior, and the IV was inserted into her shoulder. Dunn believed this was strange because he never knew of a baby getting an IV in the upper shoulder area.

Dunn explained that in the body camera video being played, he asked Mother about injuries to Ivy's nose, face and mouth area. Dunn testified that Mother claimed Ivy scratched herself, but Dunn stated that Ivy had round scabs "all over her face" that did not look like scratch marks. Dunn questioned Mother about the scab on Ivy's ear, and Mother explained that Ivy scratched herself there, too. Dunn stated that when discussing Ivy's fractured leg, Mother seemed to suggest that she preferred the fractured leg to Ivy falling and hitting her head on the floor.

Dunn testified that he then spoke with Father again, and the video of the conversation was played to the jury. Dunn explained that he asked Father to reenact how he was holding Ivy at the time he claimed she fell, and he grabbed her. This

10

was demonstrated with a towel in his left hand that is representative of Ivy. Dunn explained that it was hard for him to believe that Mother and Father went to the hospital without Father explaining to Mother what happened, and Father's explanation did not satisfy his curiosity.

Dunn stated that on November 4, 2024, he spoke with Mother and Father again at the Conroe Police Department. He spoke with Mother first and asked her about her mental health. Mother told Dunn that she was diagnosed with bipolar disorder, anxiety, and PTSD. Dunn stated that Mother explained that she used to take medication and recently resumed her anxiety medicine.

Next, Dunn testified that he interviewed Father and asked him about Ivy's fractured leg. According to Father, he grabbed Ivy's leg and squeezed it. Dunn stated that Father maintained he did not remember much about the incident. Dunn also questioned Father about his mental health, and Father responded that he had long-term and short-term memory loss and autism. Father also mentioned that he was trying to stick to the story, which concerned Dunn because he felt there was nothing to stick to if you tell the truth. Dunn stated that Father had trouble remembering if he dropped Ivy or if she hit something. When asked, Father responded that Ivy did not hit anything but that he caught her to prevent her from hitting anything.

The video recording of both Mother's and Father's interviews were played to the jury during Dunn's testimony.

11

After completing the interviews and gathering evidence, Dunn called Father and told him that he would present everything to the prosecutors. Dunn explained that once he presented his evidence to the prosecutors, that was the end of his investigation, though he did not know the exact date he presented the evidence to the prosecutors. Dunn stated that he completed a grand jury subpoena for Ivy's hospital records and that information was sent to an assistant district attorney. Dunn did not receive the medical records and did not know if they were sent or received by someone assigned to the case after him.

Dunn testified that he also spoke with the paternal grandfather, the maternal grandfather's girlfriend, medical staff, and the Department's investigators. Dunn last worked on this case in March 2025. Although Dunn does not know how the injuries occurred, he understood that the medical professionals suggested that the injuries "appeared to be more than just an accident." Dunn explained that in these investigations, it is normal to rely on doctors' opinions regarding the injury. During his investigation, Mother nor Father were arrested or charged and he does not know the status of any criminal charges.

Father testified that he was twenty-six years old during trial, and he and Mother are engaged. Father said that he works eleven to sixteen hours a week at Domino's Pizza and gets paid every two weeks. He makes $700–800 monthly. Before Domino's Pizza, Father worked for The Pool Man in Tomball, Texas, for

close to eight months but they replaced him when he had no transportation for approximately four weeks. He works at Domino's because it is within walking distance of his mother's house, but he is working on getting his car repaired and getting it insured. Father completed some repairs on his car and plans to get additional parts for the car when he gets paid next week. Father testified that he also worked for Red Wave Pools for three months and for DoorDash.

Father stated that he and Mother currently live in Cleveland, Texas with his mother and his stepdad, and that he and Mother share a bedroom. He has lived there since June, and his mother rents the home on a month-to-month basis. Father explained that he contributes towards the rent by giving $200–400, helping with groceries and walking the dog. Father testified that he and Mother contribute to the household since they moved in four months ago by helping with groceries and helping his mother's friend. Father estimated that he spends approximately $270 a month for groceries.

Before living with his mother, Father and Mother lived in a trailer that cost $700 monthly in Livingston, Texas. Mother's father paid their first month's rent. Father said that they had two cats and one puppy while living in the trailer; however, when they did not pay rent, the landlord put their pets outside. Father did not recall what month they were evicted but stated that he would give the landlord $350 every

two weeks towards the rent. He testified that they later returned to the trailer to retrieve their belongings.

Before living in the trailer, for about three months, Father and Mother lived with Mother's father, his girlfriend, and the girlfriend's two children. Father explained that they moved out because they found a place to live to prove they could be stable and did not need to rely on people. He denied that Mother's father asked him to leave but stated that Mother's father gave him $700 and told him to go check out the trailer. He testified that Mother decided that the trailer was a good fit for them and he felt it was within their budget.

Before living with Mother's father, they lived with his father, stepmother, and a friend. They began living with his father after an altercation at Mother's grandparents' house. His father purchased the home in 2008, and it is the home that he grew up in. Father stated that he lived with his father from seventh grade through New Year's 2023.

Father testified that before this case, he did not take any medications to treat his mental health, but during this case, the Burke Center prescribed him medication to treat bipolar disorder. According to Father, he was prescribed the medicine "to see how it went," and he took it for four or five months. He is not taking the medicine anymore because he ran out and was unsure if it helped him. Father acknowledged that he had a psychological examination, and they recommended he see a counselor.

14

Father claimed that he talked to a therapist this year because it was in the plan, but he could not recall when he began seeing the therapist. He found the counseling sessions beneficial in some ways but eventually stopped going to the counselor because their car was broken. He saw the same counselor for family and individual counseling.

Father denied having problems controlling his anger and stated that he was always alone and did not have many friends. Father admitted that he lost his temper with Mother but stated that it was only verbal, and he went outside to cool off. Father denied ever breaking things out of anger but admitted in 2024, that he broke the radio screen in his car after a heated discussion with his stepmother. He also denied ever driving recklessly out of anger.

Father stated that he had supervised visits with Ivy at the Department's office every Tuesday that were two or three hours. He admitted that he missed visits for one month and several other visits due to transportation issues. He last saw Ivy two months ago.

Father testified that he had hygiene issues during this case because of his depression and missing Ivy. He admitted that he told his therapist that his pets were urinating on his clothes, and he had trouble getting the clothes washed because the trailer did not have a washer or dryer. Father admitted that the trailer had a shower and sink.

Father knew that Ivy had a leg fracture, lacerated liver and scratches on her face; he knew the leg fracture and lacerated liver were serious injuries. He denied seeing any bruising behind Ivy's ear, and at one point, felt the doctors might have made up those injuries.

Father stated that on October 28, 2024, he got up around 5:30 a.m., got ready for work, and went to work at The Pool Man in Tomball, Texas until 4 or 5 p.m. At that point, he returned the work truck to the warehouse and got in his car heading home. Father stated that he was not sleepy that night and that he was suffering with depression-type issues after his brother was killed in an accident last April. He stated that he was having trouble sleeping but was winding down while Mother took care of Ivy.

On the night of October 28, 2024, Father stated that he was holding Ivy in his hand and arm, and "she was fussy." According to Father, Ivy was kicking and rolling around and he was "trying to make sure [she] had a well main [sic] diaper." He stated that Ivy kicked and rolled off his arm, and from "[p]ure instinct[,]" he grabbed one leg with his left hand and squeezed before he grabbed the other leg and laid her on the bed. He denied making a twisting motion when he grabbed Ivy's leg. He testified that Ivy could have hit the bassinet or bed frame "on the way up."

Father stated that Mother came into the room asking if he wanted her to take over, and he examined Ivy on her head and body but did not see a bruise. He did not

16

tell Mother what happened to Ivy until they were at the hospital. Father said that Mother did not ask what happened to Ivy until they were at the hospital. He believed the ride to the hospital took approximately twenty-five minutes. During this time, Mother tended to Ivy in the backseat and made sure she was buckled in properly. Father said that Mother noticed something was wrong with Ivy's leg when she picked her up and saw it was "floppy." Father admitted that Ivy's leg looked different, and during the ride to the hospital, Mother did not ask what happened because she was "freaking out" and crying. He stated that Mother was angry with him "a little bit" after the hospital but explained she understood that he would rather Ivy have a fractured leg than have a head injury from hitting the floor with blood everywhere. He testified that Mother forgave him, and he told her they were in this together and needed to make sure Ivy is taken care of. Father attributed Ivy's face abrasions to Ivy scratching herself, but he did not know how her ear was bruised or how her liver was lacerated.

Father stated that Mother is not working, and he is the only one bringing in income for them. When asked how he would support his daughter, he responded that he would eventually like to work for a pool company, because he has experience, but he has not sought the job because he does not have a vehicle. Father testified that he would have a working vehicle if Ivy had a doctor's appointment or he would have

17

family and friends on standby. He conceded that family and friends could not help getting them to visits because most work and have other things to take care of.

Father acknowledged that on September 24, 2025, when the caseworker visited, he did not have a crib for Ivy at the home, but Father stated the crib is at the maternal grandfather's home. Father also stated that he could get Ivy a crib if she is returned to his mother's home, and he would babyproof his mother's home after the trial. He testified that Ivy is currently placed with her maternal great-grandmother.

Father admitted that what happened on October 28, 2024, was "[s]hocking" and claimed it was an accident. Father testified that he did not purposely injure Ivy and would not injure her out of anger. He revealed that if upset, he would get something to eat, play video games, watch TV, relax and hold Ivy. He stated that he and Mother do not argue often but when they do, the arguments are normal.

Father testified that he would love to have Ivy returned to him because he misses her. He stated that he and Mother used a ride service through Medicaid for transportation to therapy at the Department's office, but it was later denied because it was not a normal doctor's office. He explained that he informed the Department about his car issues and that an Uber would cost from $70–200 one way. Father did not ask for closer visits at Ivy's placement home but testified that he was told the visits could only be at the Department's office or CASA.

Photos of Mother, Father and Ivy were shown to the jury, and Father testified that Ivy is always excited to see them. He stated that during their visits they would listen to music, take photos, eat, and change her diaper. If Ivy is returned to him, Father wants to have the family together and take care of her needs. Father stated that he loves Ivy over Mother any day, that he would do anything to protect her, and would never put her in danger. He denied putting Ivy in danger.

Father explained that he did not encourage Mother to get a job to help with the car repairs because she was unable to work due to having Postural Orthostatic Tachycardia Syndrome (POTS). He stated that in the past Mother worked less than one month at Blue Duck in Livingston, so the responsibility of the car repairs was on him.

Father stated that when he had supervised visits with Ivy, he once noticed a diaper rash and a bruise another time when Ivy was younger than six months. He said he informed the case worker about the bruise but did not recall her response.

Father testified that he completed the parenting classes required by the Department and completed the MET family program virtually. He stated that the class was three hours every Tuesday for twelve weeks, and he learned nutritional values for children.

Father testified that Ivy was never in a car accident when he had her, and he did not think Mother ever did anything to lacerate Ivy's liver. Father never saw

19

Mother stomp or hit Ivy, and he denied ever doing so. When asked if he ever witnessed anything that could have caused the liver laceration, Father noted that the room was small and cramped with furniture. He reasoned that Ivy could have hit the furniture, but he did not recall a specific instance where Ivy hit something that could have caused a liver laceration. He believed that Ivy's injuries were accidental.

Father stated that he has moved from his mother's home to prevent future accidents, and Ivy's current room is safe though not babyproofed. Father said that he and Ivy play with blocks, listen to music, and cuddle. He testified that he last fed Ivy on their visit two months ago. He stated that he enrolled in a fatherhood program and learned how to hold and feed the baby.

Father shared that Mother is his support network and has given him more information on parenting than anyone. He stated that he can rely on his biological mother, stepmother, stepsister, and three people from church to help out. He testified that while he is ready to have Ivy back, he and Mother are not prepared or equipped to have Ivy back "at the moment."

Dr. Dina Ahmad, child abuse fellow and physician in training, testified that she is employed as part of the CARE Team at University of Texas Health Science Center. She described her educational background and training for the jury. She explained that a fellowship is extra training, or subspecialty, after the residency and that her subspeciality is child abuse pediatrics. Through her fellowship, she is

20

working through McGovern Medical School, and she sees patients at Children's Memorial Hermann Hospital. Dr. Ahmad testified that she has given several presentations, including training to the Forensic Assessment Center Network ("FACN") on infant care, development, injuries and abuse. She explained that FACN is a connection between the Department and the child abuse pediatricians, but FACN is not controlled by the Department.

Dr. Ahmad testified that the CARE Team, which is separate from FACN, is a group of pediatricians with extra training in evaluating childhood maltreatment, abuse or neglect and is affiliated with UT Health with privileges at Memorial Hermann Hospital. The CARE Team is consulted when a child presents to the emergency room and after evaluation, there is a concern about child abuse or neglect. She explained that approximately sixty percent of the cases are either no concern for abuse or equivocal determination.

Dr. Ahmad stated that the CARE Team conducts a follow-up with the child at the CARE Clinic to follow up on the injury findings, which includes a physical exam with imaging and labs, if needed, and to follow up with the caregivers. If the child has a broken bone, the CARE Team facilitates x-rays to check on the healing. The CARE Team or the FACN Network does not look for child abuse and is primarily focused on the child's health. She explained that it is important to determine whether there is potential for child abuse to assess the child's safety after discharge.

21

Dr. Ahmad explained that the CARE Team completes an evaluation that includes assessment and determination. She stated that there are four possible determinations: no concerns for child maltreatment or injuries that are likely accidental; nonspecific, meaning the injuries could be accidental but child abuse or neglect cannot be ruled out; concern for child maltreatment; and substantial evidence of child maltreatment, child abuse, or neglect. The third determination, concern for child maltreatment, is given when there are injuries but no explanation for the injuries. Therefore, it would be concerning.

She explained that certain injuries are highly specific for inflicted injury or are more common to happen accidentally. For example, it is common for a baby to suffer a skull fracture and the caregiver to explain that the baby fell on the floor from someone's arms or the bed. Dr. Ahmad testified that this situation is common and accidental and that other factures to the clavicle or collarbone are common to see and categorized as accidental when a clear history is provided. She explained that she gathers the history by first reviewing the medical records and how the baby is presented after she receives a consultation request from the primary physician or surgeon and the reasons for their concern. Dr. Ahmad confirmed that she reviews all workups done before her involvement including hospital and emergency room records and statements or history that the parents have provided. She then reviews the social work evaluation if one was done and then interviews the parents or

22

caregivers. She conducts a full physical exam, with any recommended additional workup, blood work or x-rays, and then the CARE Team discusses their findings with the primary team.

Dr. Ahmad explained that when she speaks with the parents, she tries to determine what happened, why the baby is at the hospital, and how the injuries occurred. If the parents' explanation is inconsistent with the injuries, this is concerning for child abuse because the injuries are unexplained. She noted that the next higher level is consistent with or substantial evidence for child maltreatment; this involves cases with multiple injuries of patterned bruises, burns or fractures that the only possible explanation is substantial evidence for abuse. Dr. Ahmad testified that patterned bruises are loop-like marks caused by a belt and that pattern burns are cigarette burns. She stated that if the child is verbal, they speak with the child and include an outcry if they provide evidence of maltreatment.

Dr. Ahmad was consulted to evaluate Ivy by the Pediatric Trauma Team when she was presented to Children's Memorial Hermann Emergency. Ivy's medical records from Memorial Hermann The Woodlands were admitted as evidence, and Dr. Ahmad testified that the records stated that on October 29, 2024, Ivy was seen for leg pain and thigh deformity. She admitted that it is typical for serious injury cases to be transported to Downtown Memorial Hermann, which is where the UT McGovern Medical School and the CARE Team is located. The report from

23

Memorial Hermann The Woodlands for the left femur x-ray included findings of an acute displaced midshaft, left femoral fracture with approximately 1.7 centimeters overlap and no gross malalignment of the knee. Dr. Ahmad reviewed the x-rays for the fracture and explained that the thigh bone is broken. She testified that the break was a spiral fracture meaning it is rotational and occurs with a torsion or rotational force such as twisting an extremity. She stated that Ivy suffered a displaced fracture, which meant the bones are not aligned and on different planes.

Dr. Ahmad testified that a child's bone or an infant's bone is harder to break than an adult's bone, because it has more cartilage content and is more flexible. She explained that Ivy was treated with a Pavlik harness on both legs to keep the harness in place. The harness also immobilized Ivy's leg to allow for healing.

Dr. Ahmad confirmed that a lacerated liver is diagnosed through a liver function test that measures liver enzymes. She stated that Ivy had elevated liver enzymes, and a CT scan of Ivy's abdomen was done to check her internal organs when the laceration was seen. She explained that the CARE Team spoke with the radiologist about the finding.

According to Dr. Ahmad, she spoke with Mother and then Father, and stated that when she spoke with Mother, Father was asleep in the same room. Dr. Ahmad stated that Mother told her she was in another room when she heard Ivy crying. Mother reported that she went into the room and noticed the deformity in Ivy's thigh

and that Father stated that he was changing Ivy's diaper on the bed when she rolled over and fell.

When Dr. Ahmad spoke with Father, he provided a different explanation and stated that he was holding Ivy and he "lost a grab of her" and to prevent her from hitting the floor, he grabbed Ivy's thigh and "felt a pop." Dr. Ahmad read the notes made after speaking with Father that stated, "'Dad explained that he forcefully grabbed her left leg with both of his hands to prevent her from hitting the floor and then he heard and felt it pop.'" Dr. Ahmad stated that the primary physician at the emergency room, the social worker, and the orthopedic surgeon spoke with Mother and Father to get the explanation, as well. Notes from the social worker reveal that "'[Father] reported that patient began to roll over and had rolled off the bed. [Father] reports attempting to catch the patient and was able to catch patient by [] her leg in midair.'" Dr. Ahmad stated that this was different than what Father told her but is the same explanation from Mother. She pointed out that changing history is usually considered a flag or a concern.

Dr. Ahmad testified that the liver laceration is more concerning than the femur fracture, because the mechanism for liver laceration is blunt trauma to the stomach that "happens in a fall from a significant height, a car accident or a punch or a stomp." She stated that Ivy's femur fracture, with the history of her falling and Father trying to prevent her from hitting the ground, would be nonspecific since the history

25

could explain the fracture, though abuse would not be ruled out. The absence of any explanation about Ivy's liver laceration is "highly concerning for inflicted trauma and physical abuse."

As for the abrasions on Ivy's face, Dr. Ahmad testified that when asked, Mother responded that Ivy scratches herself, which they determined was nonspecific. She explained that nonspecific means Ivy could have scratched herself, but that inflicted trauma could not be ruled out. Dr. Ahmad noted that Ivy did not have a frenulum, the small tissue that connects the lip to the gum. She stated that it is possible for children to be born without a frenulum, and because there was no acute trauma, this was not a concern.

Next, Dr. Ahmad discussed bruising on Ivy's upper arm, and she pointed out that she never received an explanation for the bruising and denied that an IV would have been placed there. Regarding the ear bruising, it is concerning because the ear is soft and hard to bruise. Dr. Ahmad testified that bruising inside the ear or on top of the earlobe is concerning for inflicted trauma and more concerning on a five-week-old "nonmobile child."

Dr. Ahmad testified that when evaluating cases, they "look at the constellation of symptoms and injuries." She pointed out that the femur injury was uncommon, and the lacerated liver was "extremely uncommon." Dr. Ahmad stated that Ivy's case is "highly concerning for physical abuse," and given all the facts, there is clear

26

evidence of physical abuse or neglect. She testified that she is convinced there was physical abuse given the constellation of injuries and lack of explanation.

Dr. Ahmad acknowledged that a spiral fracture could occur if a parent tried to catch a failing child. She pointed out that the liver is protected by the rib cage, and Ivy did not have any damage to her rib cage. Dr. Ahmad admitted that it is possible to cause a liver laceration if Ivy hit furniture, but it would require significant force, which a fall could provide depending on the latitude.

Dr. Ahmad stated that Ivy's discharge instructions show that nurses spoke with Mother and Father about preventing a fall. She testified that notes showed nurses tried to teach Mother and Father about safety and fall prevention. As to the parents, the notes also state, "Needs reinforcement. No evidence of learning."

According to Dr. Ahmad, the Department removed Ivy on the day of her discharge, and she did not leave the hospital with the Parents.

Next, Dr. Sheela Lahoti, professor of pediatrics and Vice Dean for Admission and Student Affairs with the University of Texas Health Science at Houston, testified that she has been a licensed physician since 1995 and specializes in pediatrics and is board certified in child abuse pediatrics. Dr. Lahoti stated that she supervised Dr. Ahmad on the CARE Team and agreed with Dr. Ahmad's assessment.

Dr. Lahoti saw Ivy in the hospital and agreed that her liver laceration was highly concerning. She stated that for a liver laceration, a significant fall would have

27

to occur or a direct blow to the abdomen. She testified that it would depend on the height of the fall for Ivy's liver laceration to be the result of hitting a corner of a piece of furniture.

Dr. Lahoti testified that she only saw Ivy once in the hospital and spent between fifteen and twenty minutes in the area. She stated that reviewing the case took longer. She recalled speaking to one of the parents but did not recall whether it was Mother or Father. She did not recall either parent doing anything concerning in the hospital.

She stated that the CARE Team determined that Ivy did not hit the floor and that Father grabbed her by the leg. The physicians involved in the determination were Dr. Ahmad, the radiologist, and the CARE Team, though the final determination came from Dr. Lahoti and Dr. Ahmad.

Victor Love, psychotherapist, testified that he has a private practice and a contract with the State of Texas through the Department where he receives referrals for parents involved with the Department. Love stated that he is a licensed marriage and family therapist, licensed chemical dependency counselor, and licensed sex offender treatment provider. He has worked as a counselor for thirty-seven years.

Love testified that he became familiar with Mother and Father when the Department referred them for individual therapy and couples counseling. He stated that he began treating Father on February 25, 2025, with visits scheduled every

Tuesday, the day of his visits with Ivy for convenience, at the Department. Love recalled that Father missed ten sessions total, including individual and family sessions. He stated that Father often gave notice of his absence less than twenty-four hours before the appointment. He last saw Father for individual counseling on June 12, 2025, and he neither showed up nor scheduled the next visit.

Father's first family session with Love was on March 25, 2025, and those visits were on a recurring basis on Tuesdays. Mother and Father were absent for some family sessions and failed to attend family counseling sessions in May or July 2025. Love last saw Mother and Father at a family session together on August 12, 2025.

According to Love, he discussed Ivy's injuries that brought her into the Department's care, and Father stated that he was alone with Ivy in the bedroom trying to change her diaper. Love testified that Father said he was holding Ivy with his left arm, and "she kicked off" and fell off his arm. Love relayed that another time, Father pointed out that Ivy rolls a lot and "insinuated that she rolled off his arm." Love stated that Mother never discussed the incident that led to Ivy's injuries. He also testified the Parents had not taken accountability for the accident that caused Ivy's injuries.

Love testified that Father said he did not believe the doctors about Ivy's injuries or that all the injuries occurred as reported. According to Love, Father said

the doctors were "talking out of their butt." Father also denied knowing how the liver laceration occurred. Father claimed he did not see any bruises on Ivy, and he only saw the abrasions on Ivy's face, which he attributed to her scratching herself.

Love recalled speaking with Mother and Father in family therapy during their last session on August 12, 2025, about a time, during a visit, when Ivy fell back and the caseworker, Ms. Horton, was upset with them because they did not try to catch Ivy. Love explained that Mother claimed they could not have known that Ivy might fall.

Love testified that Mother and Father were engaged to be married, and Mother is "very much in charge" in the relationship telling Father what, when, and how to do things. He stated that Mother was constantly critical of Father and "always had something negative to say" while Father was "going along to get along." Love testified that Mother relayed several events when Father could not control his anger. She reported that he often threw things, like his phone and game controller, and he drove in a scary manner playing chicken with another car and having several accidents. Love recalled Father describing a time when he could not control his anger when he had a line of customers at work and called for assistance, and he eventually told the manager that he would use a baseball bat against him if he did not come help.

Love stated that he discussed employment with Mother and Father, because employment is important to establish the ability to provide for one's own needs as well as the children's needs. He explained that employment creates opportunities for a schedule, responsibility, social contact, stability and reliability. Love said that Father worked as a pool technician when Love started seeing him and that Father felt successful at that. Due to car trouble, Father then worked for DoorDash and later at a pizza place.

Love testified that Mother said she was studying to get her license and obtain a job selling insurance. Mother later told Love that she failed her insurance exam and planned to take it again, but after that claimed she had POTS, could not work, and would file for disability. He recalled Mother stating that she worked in a restaurant briefly and that on the way to work one day she almost had an accident. Mother conveyed that as a result she was stressed and wanted time to check her heart rate, but when the manager wanted her to start working and would not let her check her heart rate, she quit.

Love stated that he discussed finances during the sessions and explained that budgeting is important and why, including creating the ability to ensure parents can meet their own needs and their children's needs. Love testified that Mother and Father said they brought in around $4,000 but spent $4,700 on housing, an automobile, and food.

31

Love said that when he began working with Mother and Father, they lived in a very small camper near Lake Livingston but towards the end, around August 1st, they reported that they moved in with Father's mother. Love explained that he saw their car, and it had quite a bit of damage all around, including the bumpers and sides.

Regarding their hygiene, Love testified that at almost every session, Father had severe body odor, and Mother often did as well. He stated that they discussed their hygiene several times and they claimed that they did not have the time or money to wash their clothes. They also said they did not have a way to keep their clothes off the floor, so their pets defecated on the clothes. They often wore soiled clothes because they did not have clean clothes to wear. He testified that there were moments when their body odor was not detectable, but more often, they had body odor.

Love stated that Father did not successfully complete individual counseling, and he was eventually discharged without making much progress. He testified that Mother and Father also made little progress in family counseling.

Love admitted that he relied on other sources for information besides Mother and Father, including information from the caseworker, the affidavit in support of removal, and psychological evaluations. This helped Love tailor counseling to the recommendations in the psychological report, and it provided background on the areas Mother and Father needed help. Love stated that he walked by the room where

Mother and Father were visiting with Ivy, but he only poked his head in to speak briefly.

Next, Grandmother, Mother's paternal grandmother, testified that she was not involved in Mother's childhood much after Mother was adopted by her stepfather. Grandmother stated that communication with Mother ended by Mother's mother when Mother was around five years old. She testified that she reconnected with Mother during her pregnancy around June or July 2024, after her son resumed communicating with Mother. Grandmother stated that she was excited about Mother's pregnancy and hosted a baby shower to help Mother prepare for Ivy.

Grandmother recalled meeting Ivy when she was about two weeks old, and she learned that the Department became involved with Ivy on the day Ivy went to the hospital. After her son was denied placement for Ivy, Grandmother testified that she applied for placement. Then, the Department conducted a home study and background check before placing Ivy in her care. On December 16, Ivy was placed with Grandmother when she was three months old, and she is now a little over a year old. She stated that on September 24, Ivy had her first birthday, and she had a birthday party. She described Ivy as happy and healthy. Photos of Ivy throughout her time with Grandmother were shown to the jury.

Grandmother recalled that Mother initially reached out and checked on Ivy once or twice a week, but Father did not reach out until the day before Ivy's first

birthday. Grandmother explained that after Ivy had ear surgery for tubes, Mother's communication dwindled, and she did not call to check on Ivy or ask for photos. Grandmother agreed that she had the caseworker ask Mother to not reach out on the day of the surgery because she knew it would be a busy day.

Grandmother testified that Ivy visits with her cousins at least once or twice a week and has bonded with them. On a typical day, Ivy goes to daycare while Grandmother goes to work, and after they return home, they have dinner, play, bathe, and go to bed. Grandmother stated that she is willing to provide long-term care for Ivy and is willing to adopt her. She stated that she has prepared to adopt Ivy by getting her foster license and having more home studies. She shared that she would allow Mother and Father to see Ivy if it is in her best interest.

Grandmother stated that she was not involved when her son relinquished his parental rights to Mother. She testified that her son's paternal grandmother raised him, because she was fifteen when she had him. She explained that her son lived with her briefly when he was fourteen before choosing to live with his father. She noted that she raised her daughter.

She testified that Mother contacted her the week before checking on Ivy and asked how she was doing. Grandmother responded that Ivy was doing fine and stated that Mother often texts during the day while she is at work, so it is hard to have a

34

conversation. She stated that she was unopposed to Mother calling her if they discussed Ivy only.

Grandmother acknowledged that it was hard losing her connection with Mother and not seeing her from the time she was five years old until she was an adult because family is important. She agreed that Mother's and Father's relationship with Ivy is important. Grandmother stated that she has not supervised any visits with Ivy and only saw Mother and Father interact with Ivy once when the Department was involved but before placement. She explained that there were things she would have changed about how the Parents handled Ivy during the visitation, but it was not her place to comment.

Mother testified that she is twenty years old, and she is unemployed. She last worked at a restaurant for about a week in August, and it ended due to her POTS causing her to be unstable walking and needing to go to the bathroom to vomit often due to an elevated heart rate. Mother failed the exam to become a licensed insurance agent and did not have the money to retake it. She also worked at another restaurant for about a month, but it ended in part because of her heart rate and POTS.

Mother stated that she had an appointment to see a doctor about her POTS, but days before the appointment she was informed that the doctor did not accept her insurance. She stated that POTS is treated with electrolyte and salt infusions. Mother confirmed that she told the caseworker that she was considering applying for

35

disability benefits, and she finally did so, although approval could take up to one year. In the meantime, she has applied for work that would not be hard on her body.

Mother stated that POTS stands for Postural Orthostatic Tachycardia Syndrome, and it causes her blood to pool if she stands up too fast or lies down wrong, ultimately causing her blood pressure to drop and her heart rate to jump. She was diagnosed in May 2023. Mother stated that she sees doctors at the Burke Center for her POTS, anxiety, and ADHD.

Mother testified that she has a permit to drive and needs more practice before getting her license. She stated that she and Father have had car trouble but are planning to get it fixed with Father's next paycheck. She acknowledged that Father made $4,000 monthly, and most of the money went to rent and car upkeep. She stated that they lived in a camper for six months that cost $700 a month, and they lost money paying for gas for the visits.

Mother stated that they currently live with Father's mother and stepfather, though they lived with Father's father when Ivy was born and when this began. She testified that they paid Father's father $600 a month, and four additional people lived in the home until April. After April, only three additional people lived in the home. Mother, Father and Ivy shared one of the three bedrooms.

Mother said that Father's stepmother threw them out, and they went to live with her father. His home had three bedrooms, and four additional people lived there.

36

Mother and Father resided in the living room for about two months then moved out to have their own space.

Mother testified that after leaving her father's home, she and Father rented an RV in Livingston for $700 a month. She stated that they had two cats and a dog, but when they were evicted for nonpayment, the landlord threw the pets out. They then moved in with Father's mother, which is where they currently live. They pay Father's mother $200 a month, and Mother claimed they are trying to get HUD housing. Father's mother's home has two bedrooms, and only Father's mother and stepfather live there, so Mother and Father share a bedroom.

Mother testified that they went to two different "therapy places" but one place did not take her insurance, so she was kicked out. She felt therapy was helpful but claimed one ended after she missed two sessions. Mother stated that they also did family counseling, which was helpful initially, but she felt that the therapist began to focus on money.

Mother stated that she took two types of parenting classes and was supposed to do another but was never contacted. Mother described learning how to advocate for her child at school, the nutritional value of certain foods, the effects of time-out, and how relationships can affect a child.

Mother admitted that she has struggled with her mental health since she was a child and was placed in a residential facility for her mental health when her mother

37

did not want to deal with her. She stated that she was diagnosed with bipolar disorder in February 2021, and she was prescribed a "whole binder" of medication though she does not recall the names. Mother explained that she stopped taking her medication when she learned that she was pregnant with Ivy, and she was advised to see if she could handle not taking medication. If she needed medication, the doctor would have prescribed pregnancy-safe medication, but she claimed she did not need medication because she used her coping skills to not harm Ivy. She stated that she stayed off the medications after her pregnancy. Mother recalled that the medications she was on before her pregnancy were to treat anxiety, bipolar disorder, and ADHD. She was also prescribed medications for her nightmares, and she only takes that medicine every other night to last until they can get the car repaired and she can see the doctor.

Mother agreed that as a parent, it is important to take care of your mental health, and she stated that she has different coping skills including having mints and sour gum to help her. She is on the waitlist for therapy through her health insurance. Mother stated that her additional coping skills are sewing, drawing, and deep breathing exercises.

As for the incident that led to the Department's involvement, she testified that on October 28, she heard Ivy crying and thought Ivy was getting her diaper changed. She stated that Father was finishing up changing Ivy's diaper, and she could tell that

he was overstimulated because he was doing his breathing exercises. She shared that Father was calm, but she noticed that something was wrong with Ivy, and "her leg did not look right." She testified that she did not ask Father what happened because she was focused on getting Ivy the care that she needed. The car ride to the hospital took fifteen to twenty minutes, and during this time, she did not ask Father what happened because she was trying to decide which hospital would be best. Mother said that she felt Ivy's leg, and something felt wrong, and she thought it might be broken.

Mother learned that Ivy's femur was fractured at the hospital after x-rays were taken. She believed that Father caught Ivy and prevented her from hitting the floor, which would have hurt Ivy even more, though she was not in the room. She believed that Ivy hit something coming up. She admitted that she had seen Father get angry but claimed he was never violent. Mother had a moment when she was skeptical of Father's story but figured he would have slipped by now if it was not the truth.

When she learned about all Ivy's injuries, she did not ask Father if he did anything to hurt Ivy's liver because she never believed he did anything, so there was no reason to ask. She does believe that Ivy's liver was injured, and she believed that Ivy hit something resulting in her liver laceration. Mother testified that she does not believe it was possible that Father got frustrated and hurt Ivy. She stated that she has never hit or hurt Ivy, and she has never seen Father hit her.

Mother attributed the sores on Ivy's face to Ivy becoming "frustrated and fussy" and then trying to comfort herself by scratching her face. She claimed that she asked the hospital nurses about the bruise inside Ivy's ear, and they told her there was no bruise. Mother testified that she did not see a bruise in the photos shown and that what she saw looked like vomit. Mother stated that the bruise on Ivy's arm was from being tested at Memorial Hermann The Woodlands for jaundice in the emergency room. She admitted that the doctor testified that they do not put IVs in the arm, but she stated that the emergency room is different.

When asked if she took responsibility for Ivy's injuries, Mother responded that she should have changed Ivy's diaper because she "was better at it." She claimed that she went to therapy and attended as many visits as possible to get Ivy back. She stated that she hopes her disability is approved to financially support Ivy, that she could get a job, and Father could get a second job or a better job once his car is repaired. She testified that to get to the doctor's office she would use Medicaid rides, or she would keep the car though she admitted that she would need to get a license first. She would get groceries delivered or wait until Father was home. She admitted that Ivy's crib was in storage and if she got a job, Father's mother or her relative would watch Ivy. She stated that she last saw Ivy in August.

Mother testified that she reconnected with her father and grandmother in May 2023, before being pregnant with Ivy. She received prenatal care during her

pregnancy at two places, and she followed all the doctors' recommendations while pregnant. She stated that she brought Ivy to her pediatric appointments, and Ivy was doing great and was healthy. Father or his relative took her to Ivy's appointments.

Mother explained that Bob was a "nonexistent person they had." If she asked Father to do something and he got mad, she would ask if Bob could do it instead, though she does not always remember doing that. Mother testified that she tries to use "I feel" statements but sometimes she walks off or tells Father to go get on a game, which seems to work for them. She stated that she and Father are not married but still live together.

Mother testified that she advocated for Ivy by tracking when she could have her pain medicine. Mother suggested that if Ivy is returned to her care, there would be a lot more room and she would monitor her now that she is moving. Mother stated that the Department refused to move the visits to a more convenient location, and both she and Father try to keep in touch with Grandmother to keep up with how Ivy is doing. She testified that throughout the case, they lived in four cities. Mother stated that she kept in contact with the caseworker throughout the case.

Mother stated that she initially told doctors that Ivy was on the bed when she fell because that is what she assumed happened. She claimed that Ivy rolled the first time when she was around one month old. Mother admitted that she was never upset

41

with Father for dropping Ivy because accidents happen, and she believes this was an accident.

Next, Victoria Warmuth, supervisor with Child Advocates of Montgomery County ("CAMC") or CASA, testified that she has worked with CASA since 2019 and her role is to supervise court-appointed volunteers for children in the child welfare system to provide educational needs and address concerns that brought the family to the attention of the department. Warmuth stated that she became involved in Ivy's case in early July after the advocate had to temporarily step back. Warmuth visited Ivy in her daycare and placement, connected with the parents, and worked with the case worker. She explained that her duties include being responsible for the best interests of the child, providing informed and accurate recommendations to the Court, and connecting with educational providers including daycares, medical providers, caregivers, biological family, the attorneys and caseworker. She considers the physical and emotional needs of the child in the present and future when determining the best interest, along with the parents' abilities.

Warmuth testified that on September 24th, she visited Mother and Father at their current home and where they intended for Ivy to return. Neither Father's mother nor stepfather were home during the visit. According to Warmuth, both Mother and Father were home, and she saw two cats and one dog in a cage outside. She stated that there were several safety concerns including a propane tank outside, along with

42

lighters that suggested someone was smoking outside, and the home was fairly small with cleaning and household chemicals on the floor, which would be a safety hazard for a walking one-year-old. She noted litter boxes and cat food on the floor with no baby gate to prevent Ivy's access, and the bedroom did not have a sleeping space designated for her. She further noted a designated area near the door but there were clothes blocking the door, and the room had a strong scent of body odor. Warmuth stated that there was a weapon in the home, but they could not locate it, and the Parents could not say if it was secured, which was another concern with a one-year-old in the home.

Warmuth stated that there was no crib for Ivy and that the Parents discussed a bassinet which Warmuth said was inappropriate for a one-year-old. Mother and Father slept on an air mattress that did not have sheets, and the room had portable hangers along the back wall that also had a door and a pile of clothing. She did not know if the clothing was clean or dirty, but the plan was for Ivy to sleep in front of the door that may or may not have been secured. The room had extension cords throughout, along with car parts in the closet, and medications that were not being taken as prescribed. Warmuth admitted that a child did not live in the home, and there may not have been a need to babyproof the home at the time of her visit.

Warmuth testified that she discussed finance management with Mother and Father. At the time, Father's cell phone was off, and he reported that he made $600

a month and paid $400 a month in rent. Though they lived in an active area, Father reported that he could not find work in addition to his current job at Domino's. Warmuth was unable to get a clear answer from Mother about working. Warmuth testified that Mother mentioned having POTS, and Warmuth told her that she had it as well and works a part-time job. Mother also discussed wanting to move to a larger home but did not explain how they would afford it.

Warmuth discussed childcare for Ivy, and Mother suggested that "people at daycares are creeps and are pedophiles." When she asked who could watch Ivy, they were only able to provide first names.

When Warmuth discussed mental health with the parents, Father said that he was rationing his medication by taking them every three days because they could not get to the facility, although Warmuth noted that there was a facility seven minutes from their home. Mother told Warmuth that she could not find her medications, so it was unclear if or how often Mother was taking them. Warmuth testified that she talked to Mother about the Texas Women's Program that would cover psychiatric medication and counseling, and Mother insisted that it did not.

Warmuth stated that Mother's and Father's mental health care concerned her because parents need to be stable, whether that meant to be on mediation, in therapy, or both. She understood that Mother and Father have mental health issues that need to be addressed and require support. She was concerned that they would be unable

to provide adequate care for Ivy if their needs are not being met. This presents a safety risk for Ivy.

Warmuth stated that she has met with Grandmother and been to her home several times and it appears safe. She testified that Ivy is a happy baby, and her needs are being met. Warmuth recommended that Mother's and Father's parental rights be terminated so that Ivy can be adopted by Grandmother. Warmuth explained that recommendation is based on Ivy's immediate needs for physical and emotional safety and on Mother's and Father's lack of plans, instability, mental health, housing, and the reason for removal since they do not know what exactly happened to cause her injury. She testified that "the idea of sending a child back into that environment is frightening."

Warmuth observed two or three visits in the beginning and noted that Mother was "a little combative" when given feedback about how to hold Ivy. According to Warmuth, a one-and-a-half to two-month-old cannot hold her head up, but Mother and Father had inappropriate expectations of what Ivy could do at that age. She further testified that she sent Mother and Father TBRI training videos, but they did not follow through with it. She did not speak with the other people living in the home with Mother and Father. Warmuth's visit with Mother and Father was before their twelve-week parenting course; therefore, she did not see what they might be able to demonstrate after the parenting class.

45

Next, Teresa Horton, conservatorship specialist for the Department, testified that she has been with the Department for six years. As a case worker, she works with the children to make sure their educational, medical, and dental needs are met, along with ensuring they thrive in a safe environment. She works with the parents to develop a family plan and build services around the reason for the child being in the Department's care.

Horton was assigned to this case in November 2024 with the goal of family reunification or kinship or foster care. Horton testified that at the end of a case, they monitor the family for a certain amount of time after the child is returned to them. Cases in the Department normally last one year, because the dismissal deadline is one year from the date the child was brought into the Department's care.

Horton explained that a family plan lists services such as parenting classes, psychiatric evaluation, and counseling, for each parent. Horton stated that she made a service plan for Mother and Father. Mother's plan included parenting classes, individual counseling, family counseling, psychological evaluation, and a psychiatric evaluation. Though Horton was told that Mother completed the psychiatric evaluation, she never received the report from the Burke Center. Horton stated that Father's plan was identical to Mother's plan, and she did not receive Father's psychiatric evaluation, if it was completed. Horton did receive a medication list. Horton stated that Mother and Father initially chose the Burke Center. Horton

explained that the service plans are long-term treatment plans, and if the parents move, she will set up providers in the new area. She stated that she set the parents up for psychiatric evaluations, but Mother asked if they could do the evaluations at Tri-County, and she allowed it. Horton stated that the Department pays for the services. She testified that in the beginning there was a concern for substance abuse, but after they provided a drug test, substance abuse counseling was removed from Mother's and Father's plan.

Horton testified that she does not consider the parents to have stable housing. In the beginning, they lived with Father's father and stepmother, and then they moved out in December when Father's stepmother asked them to leave. They then moved to Mother's father's home for approximately three months before moving into an RV in Livingston, Texas. They lived in the RV approximately six or seven months before they were evicted for nonpayment. According to Horton, Mother and Father then moved in with Father's mother and stepfather, which is where they live today. Living in four different places during this case is a concern as a case worker, because it shows lack of housing stability, which is important for a child. She spoke with Mother and Father in the beginning about getting on a waitlist for housing, but the Parents said they had their own plans.

Horton testified that she spoke with Mother and Father monthly, and discussed the visits, the cancelation of the visits, the status of Mother's disability

47

application, and the classes in the service plan to keep Mother and Father on track. Horton stated that she discussed employment with the Parents, because it is important in cases with the Department to show financial stability, security, and to show your ability to take care of your children. She recalled that Father was first employed by a pool company as a pool tech, but he was let go after calling in too often once the car had broken down. According to Horton, the car broke down at the end of May or early June, and the Parents were working to save money to fix it. It seemed like the car was repaired because Mother and Father began attending visits again, but it broke down again. Horton recalled that Father worked for DoorDash and for a pizza company, she believed. Horton stated that Mother worked for a short amount of time and was working on getting her license. She recalled that Mother took classes to sell life insurance and worked at a restaurant for a short time. Mother told Horton that she could not handle the heat in the kitchen, so she quit the restaurant job. Mother informed Horton that she applied for disability benefits, but Horton never saw the completed application.

Horton stated that on September 24, she visited the home where Mother and Father currently live. She stated that Father said that he made $600 a month, and Mother was not working.

Business records from Mother's therapist, Kayla Baca, were admitted as evidence, and Horton testified that she reviewed the records when she received them

48

in June and was concerned. Horton testified that the records reveal medical issues such as bipolar, general anxiety disorder, POTS, that Mother was five months postpartum, and that she vapes occasionally.

On the notes from March 12, 2025, Horton testified that under area of risk, low risk of suicide ideation was written with no intent to act. The notes also suggest that Mother reported that Ivy kicked hard off Father, because she did not want her diaper changed causing Father to drop her. The notes state Mother picked Ivy up "'and her leg was like this'" and the notes suggest that Mother was acting out a floppy broken limb. The notes state that Mother avoided saying that Ivy's leg was broken from a fall, that the Department was contacted by the emergency room as a mandated reporter, and that Mother quickly redirected the conversation about various off topic subjects.

Horton testified that the notes reveal that on March 17, 2025, Mother was a no-show, and on the next page it lists medications such as Abilify, Hydroxyzine, and Prazosin. The notes then state that Mother reported that she had refilled those medications and intended to begin taking them because they helped her in the past. The notes further suggest that Mother reported she lost two of the three medications, and she completed a parenting education course and stated that six-month-olds do not play with toys. Horton read the notes that reflected that Mother believed she had ADHD and had many chaotic people in her life. The notes stated that Mother spent

49

most sessions distressed and yelling at her cats intermittently, and Mother had very little understanding of child development or appropriate learning modalities for infants.

Horton recounted notes dated March 27, 2025, that said Mother had a birthday celebration but reported that strangers arrived, so she had a knife in her hand to protect herself, but the strangers were Mormons. Mother reported that she still could not locate two medications and felt like she could not catch a break.

Horton read notes dated March 31, 2025, that stated Mother was in a bad mood and that the house is a mess because Father does not help. The notes stated that Mother briefly mentioned Ivy had a broken leg. It was reported that Mother continued to demonstrate poor emotional regulation, paranoid thought patterns, thought-blocking patterns and referred to Ivy's broken leg as if Ivy did it herself while refusing to state the actual events of the incident and who is to blame.

Notes from April 7, 2025, said that Mother had problems with a neighbor who allowed their flea-covered dogs to roam free. The notes state that Mother adopted one dog and called animal control on the others.

Notes from an April 14, 2025, session show that Mother stated that she and Father were unable to see Ivy that week due to his work schedule. She also reported that they have a chance to make extra money through DoorDash to get Ivy an Easter basket and possibly go to ComicCon. The notes suggested that Mother was

preoccupied with social drama of her sixteen-year-old brother and that Mother demonstrated possible developmental delays with lower cognitive reasoning skills.

Next, notes from April 21, 2025, were read that said Mother had not located her missing medication and planned to purchase a lockbox for medicine storage, and she and Father will postpone a wedding until Ivy is home. The notes stated that on May 5, 2025, Mother was a no-show.

Horton read notes dated May 19, 2025, that reflected that Mother requested an impromptu session because of troubling events. The notes stated that Mother reported that Father lost his job due to unreliable transportation after their car broke down, and she had not seen Ivy in three weeks and knew the Department was working to award custody to Grandmother. The notes reported that Mother and Father are "'at each other's throats'" because they have no car and nowhere to go, are late on rent, and was given a three-day notice to vacate if they did not pay the rent. Mother reported that they were trying to sell items to make rent and fix the car. Mother conveyed that she is not sleeping well and only ate a full meal because friends felt sorry for them and took them to Whataburger the day before. Mother reported that she had been eating the food in the house sparingly and that she is taking her medications as prescribed. The notes stated that Mother exchanged text messages with her father and cried after reading them, saying that her father never shows up for her. The notes further indicated that Mother was disappointed in

Father's lack of initiative to solve their problems, and he "'threw a fit'" when she decided he needed to sell his X-box for rent money. Mother expressed continued frustration with the case worker. The notes indicated that Mother did not demonstrate any understanding of the consequences of her choices and actions; she continued to blame others for her misfortune or inability to carry out productive tasks. Horton testified that she was not present for the therapy sessions and does not know if the notes are an accurate transcription of what Mother said.

Horton testified that beginning November 9, 2024, parent-child visits were scheduled for every Tuesday from 9 a.m. to 11 a.m. She stated that some visits were great, while others were decent or concerning. Horton, or an available case worker if she was unavailable, supervised the visits with the CASA advocate. At the time, Ivy was in her brace, and Horton felt Mother was too rough holding Ivy and did not take redirection well when told to support Ivy's head. Horton described other instances when Mother pulled on Ivy's leg in a rough way and blew on her stomach in a way that made Ivy cry. Another time, when Ivy was just learning to sit up on her own, she fell backwards and hit her head, and Mother and Father only got up to check on Ivy after Horton reacted. Horton testified that she was concerned about reinjury of Ivy's leg due to Mother and Father holding her in an awkward position that caused Ivy to cry.

Horton stated that during a visit, Mother and Father brought up the topic of "whipping and switching their children" and Horton told them that was not an appropriate topic especially considering where they were. She recalled that Mother and Father would not have full-blown arguments during visits, but there were times when Mother told Father that he would be on the couch that night or she would "shush" him. She pointed out that they fell asleep during a visit, and remained asleep for twenty-five to thirty minutes, while Ivy was awake. Horton recalled that she had to tell Father to make sure he cleaned Ivy well after a dirty diaper because he did not get in the crevices. Horton stated that Dad changed most of Ivy's diapers. She testified that despite concerns, she did not stop the visits but would have if Ivy were in imminent danger. She stepped in to redirect the Parents when she saw concerning behavior. Though Mother and Father listened, Horton stated that neither handled her direction well.

According to Horton, the Parents last visited Ivy on August 12, after she coordinated transportation for them. This is not the normal procedure for the Department to provide transportation. Part of the service plan is to be able to get to and from visits, and the Parents knew of that expectation. She confirmed that the Parents missed quite a few visits with Ivy and sometimes they informed her in advance while other times they were no-call/no-shows. Their excuses for missing visits were no transportation mostly, or that they were sick. Horton recalled that

Mother asked for accommodation for the visitation location once, but she informed Mother that the supervised visits were at CASA or the Conroe office. Horton testified that the parents were fairly regular on their visits, but they would cancel due to lack of transportation or sickness. Horton admitted that she canceled one visit when she was sick and she gave the Parents an extra hour on two visits to make up the canceled time. Horton testified that the Parents were not always clean when they came to visits.

Ivy's medical records from Lake Area Pediatrics, the facility that Ivy received care from after she was born, were admitted as evidence. Horton testified that she reviewed the documents at the beginning of the case and was concerned about notes that showed Ivy's failure to thrive before being in the Department's care. Other notes in the records further reflected that Ivy was well-developed, well-nourished, and under no apparent distress. A note dated October 24, 2024, states that Ivy was underweight rather than failing to thrive. The records also state that Ivy was immunized and attended all well-baby checkups. Horton agreed that the pediatrician is a mandated reporter and there was no report of concern.

A summary of the visits was admitted as evidence. Horton explained the color key of the summary and stated that items marked red are visits the Parents canceled. She testified that the Parents missed approximately forty-eight hours of visitation which was about twenty-four visits, and they did not maintain significant contact

with Ivy. She did not believe the Parents demonstrated an ability to provide a safe and stable environment for Ivy. Horton testified that there were concerns about Ivy's continued safety, the lack of actual stable housing and lack of actual financial stability, because neither Mother nor Father could keep a job. She believed it is in Ivy's best interest that the Parents' rights are terminated and that Ivy be adopted by Grandmother.

Grandfather testified that he is Mother's biological father, and he did not raise Mother after his divorce. According to Grandfather, Mother was hidden from him when she was around six years old. He resumed contact with Mother when she was about seventeen years old, and he stayed in contact with Mother daily during her pregnancy.

Grandfather learned of Ivy's injury on the day it occurred when the Parents called, and he went to the hospital. The Parents told him that Ivy fell but was injured when Father grabbed her and pulled her back up.

He testified that he offered to be a placement for Ivy, but she was eventually placed with his mother. He last saw Ivy at the end of September for her birthday party, and she seemed happy and healthy.

Grandfather recalled that Mother and Father lived with him for about four months, and he asked them to move "because it was disrupting our normal everyday lives." He testified that they were messy, did not pick up after themselves, did not

get along well, and were childish. After leaving his home, Mother and Father moved into an RV, and he gave them money for the first month's rent to help them.

An audio of a voicemail that Father left on Grandfather's phone was admitted as evidence and played. In the audio, Father is upset and tells Grandfather to fix their car because they have been waiting for four weeks. Grandfather stated that after the voicemail, he decided that he was done helping them. He believed that he last spoke with Mother around the time Father left the voicemail.

Dr. Jenny Stadler testified that she has been a licensed clinical psychologist since 2006 and that about seventy-five percent of her practice is Department referrals. She explained that the Department pays for a completed evaluation.

Dr. Stadler stated that in March 2025, she evaluated Mother and Father, and the evaluations were admitted as evidence. She explained that a psychological evaluation takes about three hours and includes completing paperwork and conducting an extensive interview. Afterward, she prepares a report. Dr. Stadler stated that she always receives case information from the Department and sometimes receives background records. She recalled that here, she knew that both parents received treatment from the Burke Center, a mental health center, but the records were not made available to her although she tried to get them.

Dr. Stadler testified that Mother relayed Ivy was dropped. Regarding her own past, Mother stated that she experienced physical and emotional abuse but denied

any physical abuse by Father, although Mother stated that Father could be "very angry at times and that he might throw things[,]" and had "mood switches." She stated that Mother's statements about Ivy raised a red or pink flag, because Mother was attributing infant behavior to intentionality and believed Ivy enjoyed abusing her. Mother reported a significant history of mental health treatment and that she was in a psychiatric hospital approximately seven times since the age of fourteen. Mother also reported that in 2022, she was in residential treatment but did not feel anything helpful and that it was emotional abuse. According to Dr. Stadler, Mother revealed that she was diagnosed with bipolar disorder, generalized anxiety disorder, depression, and ADHD. Mother shared that she was prescribed "a lot of medicine as a child," and while in treatment. Dr. Stadler also stated that Mother indicated that she had POTS, a condition that Dr. Stadler believed caused fainting and a racing heart. During her evaluation, Mother described instances that caused Dr. Stadler to believe that she was dissociating and pretending she was in a different place due to trauma. Dr. Stadler's notes also stated they discussed suicidal ideation, and Mother reported that she last experienced suicidal ideation when this case began. Dr. Stadler testified that Mother's unemployment was not unusual for her age, but Mother had an unusual interest in Care Bears and belonged to a Care Bear group. According to Dr. Stadler, Mother indicated that she had a decent number of social relationships,

57

and she relied on Father, her stepmother, and a new friend who she met online for social support.

Dr. Stadler's overall impression of Mother was that she was emotionally immature. Dr. Stadler based this on Mother's statements about Ivy, her interests, and how she discussed her relationship with Father. According to Dr. Stadler, this lack of emotional development is not unusual for someone who has had many traumas. She said that she conducted an ADHD test on Mother, and it did not show ADHD, but she may have problems with distractibility. Dr. Stadler said that she also conducted a Personality Assessment Inventory on Mother to measure personality and emotional functioning, and the results were consistent with what Mother reported, but Mother tended to respond in an overly emotional manner. Dr. Stadler testified that she gave three additional parenting instruments, the Child Abuse Potential Inventory and two that would show a parental stress scale. Mother's score suggested moderate stress in the parenting role which is unusual, and she did fine on the other stress scale. Dr. Stadler indicated concern on the Child Abuse Potential Inventory because Mother met the cutoff level to be high risk for child abuse.

According to Dr. Stadler, Mother relayed that she was prescribed Prazosin, Hydroxyzine, and Abilify. Dr. Stadler stated that the Abilify was consistent with her bipolar disorder, and the Hydroxyzine was consistent for the anxiety symptoms Mother described. That said, Prazosin is typically prescribed for nightmares

consistent with PTSD, but Mother did not report that diagnosis. Dr. Stadler did not feel that Mother met the mood criteria for bipolar disorder, but Abilify can be prescribed for many things. She stated that many symptoms Mother described were consistent with personality disorder traits but given Mother's emotional immaturity, some of her behaviors were consistent with a flamboyant, active teenager, and not personality disorder.

Dr. Stadler determined that in Mother's case, there is a risk due to her mental health disorders and the concern for her emotional immaturity. She explained that mental health disorders can be treated with medication or through a variety of individual therapies. She stated that it is best for patients prescribed psychotropic medications to be consistent and regularly meet with a psychiatrist. Dr. Stadler admitted that she did not believe Mother had taken any parenting classes, but she stated that parenting classes might not change the risk.

Regarding Father, Dr. Stadler stated that when she performed the psychological evaluation, he reported physical abuse as a child when he was disciplined with a pool stick and punched in the face. According to Dr. Stadler, Father reported that he was diagnosed with bipolar disorder, ADHD, and autism at age five. Father reported to Dr. Stadler that Father had significant difficulty with speech, eye contact, and social communication. Dr. Stadler testified that Father reported that in the past he used alcohol, smoked marijuana, and took Xanax and

mushrooms. Father also reported past suicidal ideation and described an incident approximately three years earlier where he had been using alcohol and drugs and had a knife or gun in his hand, but a friend stopped him. He also reported a family history of substance abuse. Father said that he liked playing video games.

Dr. Stadler testified that she did testing on Father, and Mother stated that she would help Father with the written form, but Dr. Stadler did not allow it. Testing showed that Father's reading ability was at a third-grade level, so he was only required to do one of the parenting instruments and she did not give him any advanced instruments. The instrument was consistent with Father's reporting of a history of verbal difficulties as a child. She testified that she examined three areas of Father's functioning, including executive functioning, attention, and learning and memory, which are part of an executive functioning package. Father struggled to follow the testing sequence for some parts that dealt with sequencing and cognitive flexibility, even at a third-grade level, including the order of the alphabet. Dr. Stadler explained that she stopped the test at that point because the next part required time sequencing numbers and letters, and there was no point in continuing if he could not sequence the letters. She testified that next was a color word interference test that evaluated the brain's flexibility. She noted that Father made almost no errors, but his response time was very slow to the point that she sensed he might have attempted to not do well by performing very slowly. Dr. Stadler was concerned that Father was

malingering or attempting to look worse than he was and she was unclear on Father's motivation. She did not test him for malingering. She did not find his memory to be impaired, but Father relied on his memory loss to not answer questions, which was concerning. Dr. Stadler testified that she conducted the Child Abuse Predictor Inventory on Father, and he was above the abuse cutoff for being consistent with parents who are adjudicated abusers.

Dr. Stadler verified that Father was prescribed Prozac and Hydroxyzine, and that such medications are generally prescribed for bipolar disorder.

She recommended that Father be observed interacting with Ivy by a trained parenting education or family therapist with the goal of assessing his ability to recognize and meet Ivy's developmental needs with appropriate intervention.

Dr. Stadler testified that she met with Mother and Father at the Department's office but never observed their visits with Ivy, though it might have been helpful but hard to arrange.

Before closing arguments, Father's counsel, R. Douglas Downing, informed the trial judge that during recess, he saw Horton, the Department's caseworker, conversing with a juror. Counsel stated that he did not know the nature of the conversation, but he immediately contacted the Department's counsel, Tamara Holland. Downing stated that Horton and the juror were sitting next to each for a few minutes, at the very least.

Holland responded and acknowledged that the communication was inappropriate and stated that Horton said that they were talking about lunch. In response, the trial judge called Horton back to testify about what was discussed.

Horton testified that after realizing that the door was locked, she sat in the hallway and a couple jurors came by and sat down before going into the jury room. She believed it to be juror number one that she spoke with. Horton stated that the juror mentioned not wanting to go inside the juror room, because it was loud and then they talked about lunch. Horton testified that she did not remember all the conversation, but it was simply her being cordial. Horton admitted to hearing the trial court's admonishments about not speaking with the jurors, and the conversation went beyond saying good morning or good afternoon. Horton testified that she did not know that being cordial was inappropriate but acknowledged that having a conversation with a juror was inappropriate. Horton testified that they did not discuss the case.

According to Horton, the juror stated that she did not leave for lunch and Horton responded that she went to Chick-Fil-A which is where the conversation ended. The juror also thanked Horton for her service, which Horton understood to mean her job.

After Horton's testimony, Downing moved for a mistrial due to the communication, and the trial court and parties addressed replacing the juror with an

alternate. Mother's counsel, Claire Lindsay, asked that Horton's testimony and any exhibits Horton proved up be struck from the record and that the jury charge include a mistrial instruction. The trial court denied the request.

The Juror also testified that Horton complimented her bracelets, and she responded that they were great for travel and in the pool. The Juror stated that she did not speak with any other jurors about her conversation with Horton or the case, and she remembered the jury instructions given at the beginning of the case. The Juror said that she thanked Horton for her service but had not spoken to any jurors about the testimony or about any of the parties.

At the conclusion of the testimony, the trial judge excused the Juror along with juror number thirty-nine, from jury duty. Lindsay, Mother's counsel, then reurged a motion for a mistrial based on Horton's conversation with the Juror, and the trial court denied the motion. The trial court reasoned it had no basis to believe that the remainder of the jury was tainted in any way. The trial judge then informed juror number thirty-eight that he was on the panel, and he was sent to the jury room.

After deliberating, the jury answered "yes" to the following questions:

Question No. 1:

Do you find by clear and convincing evidence that [Mother] has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child?

Answer "Yes" or "No" as to each child:

63

[Ivy]: Yes

Queston No. 2:

Do you find by clear and convincing evidence that [Mother] has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child?

Answer "Yes" or "No" as to each child:

[Ivy]: Yes

Question No. 3:

Do you find by clear and convincing evidence that [Mother] has constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months and: (1) the Department or authorized agency has made reasonable efforts to return the child to the mother; (2) the mother has not regularly visited or maintained significant contact with the child; and (3) the mother has demonstrated an inability to provide the child with a safe environment?

Answer "Yes" or "No" as to each child:

[Ivy]: Yes

Question No. 4:

Do you find by clear and convincing evidence that termination of the parent-child relationship between [Mother] and the child is in the best interest of the child?

Answer "Yes" or "No" as to each child:

[Ivy]: Yes

Question No. 5:

64

Do you find by clear and convincing evidence that [] the Department made reasonable efforts to return the child to [Mother] and despite those efforts, a continuing danger remains in [Mother's] home?

Answer "Yes" or "No" as to each child:

[Ivy]: Yes

Question No. 6:

Do you find by clear and convincing evidence that [Father] has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child?

Answer "Yes" or "No" as to each child:

[Ivy]: Yes

Question No. 7:

Do you find by clear and convincing evidence that [Father] has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child?

Answer "Yes" or "No" as to each child:

[Ivy]: Yes

Question No. 8:

Do you find by clear and convincing evidence that [Father] has constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months and: (1) the Department or authorized agency has made reasonable efforts to return the child to the father; (2) the father has not regularly visited or maintained significant contact with the child; and (3) the

father has demonstrated an inability to provide the child with a safe environment?

Answer "Yes" or "No" as to each child:

[Ivy]: Yes

Question No. 9:

Do you find by clear and convincing evidence that termination of the parent-child relationship between [Father] and the child is in the best interest of the child?

Answer "Yes" or "No" as to each child:

[Ivy]: Yes

Question No. 10:

Do you find by clear and convincing evidence that [] the Department made reasonable efforts to return the child to [Father] and despite those efforts, a continuing danger remains in [Father's] home?

Answer "Yes" or "No" as to each child:

[Ivy]: Yes

On November 6, 2025, Mother filed a Motion for New Trial based on juror misconduct. It was overruled by operation of law.

Mother and Father appeal the termination order and argue the evidence is legally and factually insufficient to support termination under section 161.001(b)(1)(D), (E), (N), and (2). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (2). Mother also challenges the appointment of the Department as sole

managing conservator and the denial of her Motion for Mistrial based on improper juror communication.

## Father's Appeal and Error Preservation

The Department argues that Father failed to preserve his legal and factual sufficiency complaints. To preserve a legal sufficiency challenge for appeal, the appealing party must have asserted the point by (1) a motion for instructed verdict, (2) a motion for judgment notwithstanding the verdict, (3) an objection to the submission of the issue to the jury, (4) a motion to disregard the jury's answer to a vital fact issue, or (5) a motion for new trial. *See Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex. 1991); *In re J.B.*, No. 09-16-00442-CV, 2017 WL 2180682, at *7 (Tex. App.—Beaumont May 18, 2017, no pet.) (mem. op.). Because Father filed no such motion, his legal sufficiency complaint was not preserved for appellate review. By failing to file a motion for new trial, Father also failed to preserve his factual sufficiency complaint. *See* Tex. R. Civ. P. 324(b)(2); *In re J.B.*, 2017 WL 2180682, at *7. Because Father never brought his legal or factual sufficiency challenge to the trial court's attention, Father's legal and factual sufficiency issues have not been preserved for appeal. *See* Tex. R. Civ. P. 324(b)(2); *Smith*, 804 S.W.2d at 510–11; *In re J.B.*, 2017 WL 2180682, at *7.

**Standard of Review**

We review cases involving termination of parental rights under a clear and convincing standard of proof, which is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. §§ 101.007, 161.001(b); *In re E.N.C.,* 384 S.W.3d 796, 802 (Tex. 2012) (citing *In re J.F.C.,* 96 S.W.3d 256, 263 (Tex. 2002)) (other citations omitted). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2); *see also In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). We will affirm a judgment if any one of the grounds is supported by legally and factually sufficient evidence and the best-interest finding is also supported by legally and factually sufficient evidence. *In re C.A.C., Jr.*, No. 09-10-00477-CV, 2011 WL 1744139, at *1 (Tex. App.—Beaumont May 5, 2011, no pet.) (mem. op).

Under legal sufficiency review, we review all the evidence in the light most favorable to the finding to determine whether a "reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* If no

68

reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, the evidence is legally insufficient. *Id.*

In a factual sufficiency review, the inquiry is whether the evidence, viewed in a neutral light, "is such that a factfinder could reasonably form a firm belief or conviction about the truth of the …allegations." *In re C.H.*, 89 S.W.3d 7, 25 (Tex. 2002); *In re J.L.B.*, 349 S.W.3d 836, 846 (2011). If, in weighing disputed evidence, the factfinder could have reasonably resolved the conflicts to form a firm conviction that the allegations constituting the grounds for termination were true, then the evidence is factually sufficient, and the termination findings must be upheld. *C.H.*, 89 S.W.3d at 18–19; *In re J.F.C.*, 96 S.W.3d at 266.

**Predicate Grounds**

Since findings of condition endangerment under subsection D and conduct endangerment under subsection E may be based on the same acts or omissions, we consider them together. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re B.P.*, No. 09-22-00031-CV, 2022 WL 2251739, at *8–9 (Tex. App.—Beaumont June 23, 2022, no pet.) (mem. op.). Under subsection D, parental rights may be terminated based on a single act or omission by the parent. *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied); *see also In re A.M.*, No. 09-19-00075-CV, 2019 WL 4064579, at *18 (Tex. App.—Beaumont Aug. 29, 2019, pet. denied) (mem. op.). Termination under subsection E requires more than a single act

or omission and a "'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *See In re L.E.S.*, 471 S.W.3d 915, 923–25 (Tex. App.—Texarkana 2015, no pet.) (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)). Under subsection D, we examine the time before the child's removal to determine whether the environment of the home posed a danger to the child's physical or emotional well-being. *See In re L.E.S.*, 471 S.W.3d at 92 (citing *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)); *see also In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (citations omitted). It is unnecessary that a parent know with certainty the child is in an endangering environment; instead, awareness of the potential for danger and disregarding the risk is enough to show endangering conduct. *See In re J.H.*, No. 09-20-00056-CV, 2020 WL 4516860, at *10 (Tex. App.—Beaumont Aug. 6, 2020, no pet.) (mem. op.) (citation omitted).

Under subsection E, the evidence must "show a conscious course of conduct" to terminate a parent's rights. *In re C.M.C.*, 554 S.W.3d 164, 172 (Tex. App.—Beaumont 2018, no pet.) (citation omitted). We may consider actions occurring before and after a child's birth to establish a "course of conduct." *Id*. "A parent's conduct in the home can create an environment that endangers the child's physical and emotional well-being." *In re M.S.*, 662 S.W.3d 620, 629 (Tex. App.—Beaumont 2023, pet. denied) (citation omitted). "'The factfinder may infer from past conduct

70

endangering the child's well-being that similar conduct will recur if the child is returned to the parent.'" *Id.* (quoting *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). Evidence of a parent's failure to comply with services to improve their mental health is a factor that a factfinder can consider in determining whether a parent has engaged in a course of conduct that endangered the physical and emotional well-being of a child. *See In re S.R.*, 452 S.W.3d 351, 365 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A parent's untreated mental illness can expose a child to endangerment, because when a parent fails to take required medication, the parent can behave erratically and neglect the child's care. *See In re P.H.*, 544 S.W.3d 850, 857-58 (Tex. App.—El Paso 2017, no pet.). "Generally, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *In re J.S.*, No. 09-20-00294-CV, 2021 WL 2371244, at *8–9 (Tex. App.—Beaumont June 10, 2021, no pet.) (mem. op.) (citing *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

The evidence at trial established that Mother reported that she was diagnosed with bipolar disorder, depression, anxiety, and ADHD, and she stopped taking her medicine during her pregnancy. After Ivy's birth, Mother reported at one point that she did not take her medication as prescribed and skipped days to help the medication last until she could get to the doctor. In another instance, Mother reported

that she could not locate her medications for a period of at least five weeks and needed a lockbox to store her medicine.

The evidence also showed that Mother lived in four different locations during the case and failed to obtain a stable living environment. At the time of trial, Mother was living with Father, Father's mother, and Father's stepfather in a small home that did not have a designated sleeping space for Ivy and was unclean. Mother slept on an air mattress with Father, and Mother could not locate a firearm that was at home and did not know if firearm was secured. Mother continued to live with Father throughout the case despite her knowledge of Father's anger management issues and violent outbursts that included Father throwing things when upset. The evidence showed that Mother did not exhibit concern about how Ivy suffered substantial internal injuries such as a fractured femur, lacerated liver, and bruises while in Father's care when she was an immobile infant at five-weeks old. This was despite a determination by hospital specialists that the injuries, particularly the lacerated liver, were "highly concerning" for child abuse.

The evidence established that Mother failed to obtain stable employment throughout the case, often using her medical conditions for the reasons she either could not maintain employment or even gain employment. Mother depended on Father to provide financially for her and Ivy despite Father's inability to maintain or gain employment to do so. Evidence was also presented that Mother struggled with

her hygiene and was often unclean with an odor during visits and therapy sessions. Mother also admitted during the case that the home had little food, and she only had a full meal because friends felt sorry for them and took her and Father to Whataburger. Courts have held that violent conduct, and employment and housing instability before and during the case creates a course of conduct from which the factfinder could determine the parent endangered the child's emotional and physical well-being. *See id.*

Viewing the evidence in the light most favorable to the jury's findings, we conclude that the jury could reasonably have formed a firm belief or conviction that Mother knowingly placed or knowingly allowed Ivy to remain in conditions or surroundings that endangered her physical and emotional well-being and engaged in conduct or knowingly placed Ivy with persons who engaged in conduct that endangered her physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25.

## Best Interest Challenge

We must next determine whether the Department established by clear and convincing evidence that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). We analyze this nonexclusive list of factors:

> (A)   The desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these

73

individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent.

*Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *In re K.S.,* 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.). It is unnecessary to prove all these factors as a condition precedent to parental-rights termination. *In re C.H.*, 89 S.W.3d at 27. There is a strong presumption that the best interest of the child is served by keeping the child with its natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

At the time of trial, Ivy was about a year old. The CASA volunteer and caseworker testified that Ivy is in a safe and stable home with Grandmother where her physical and emotional needs are being met. The CASA volunteer recommended that Mother's parental rights to Ivy be terminated so that Grandmother could adopt Ivy. Both the CASA volunteer and case worker stated that it was in Ivy's best interest to terminate Mother's parental rights to Ivy and remain with Grandmother. She stated that she made the recommendation for Ivy's removal based on Mother's life uncertainty, lack of stability regarding employment, housing and mental health. Mother testified at trial, and the evidence showed that Mother (1) could not reasonably explain how Ivy suffered a broken leg, lacerated liver, bruises, and abrasions, (2) failed to maintain stable employment, (3) failed to provide a stable

74

and safe living environment, (4) failed to take her medications as prescribed, (5) failed to maintain significant contact with Ivy, (6) had poor parenting abilities, and that (7) Ivy was in a long-term placement with a relative who was meeting her needs and providing a stable home. After examining the evidence presented at trial and considering the *Holley* factors, the evidence is legally and factually sufficient to support the jury's finding that termination was in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Holley*, 544 S.W.2d at 371–72.

Based on the record before us, we conclude the evidence is both legally and factually sufficient to support the trial court's termination of Mother's parental rights based on the predicate endangerment findings under subsections D and E, and termination was in the child's best interest.

We overrule Mother's issues one, two, and four.

### Appointment of the Department as Managing Conservator

In her fifth issue, Mother argues that it was an abuse of discretion to appoint the Department as managing conservator of Ivy. According to Mother, there was no evidence of ongoing abuse, neglect, substance abuse, domestic violence or unsafe living conditions attributable to Mother that would justify removal of a parent from the role of managing conservator.

Conservatorship determinations are subject to review for abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). We will reverse the trial court's

appointment of a managing conservator only if we determine whether it was arbitrary or unreasonable. *Id.*; *In re N.T.*, 474 S.W.3d 465, 479 (Tex. App.—Dallas 2015, no pet.). The Family Code creates a rebuttable presumption that a parent will be named the child's managing conservator unless the court finds that such appointment would not be in the best interest of the child "because the appointment would impair the child's physical health or emotional development[.]" Tex. Fam. Code Ann. § 153.131(a), (b). The finding was made by the jury in this case when it determined that Mother knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child, and that Mother engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child.

When the parents' rights have been terminated, Family Code section 161.207(a) governs the appointment of a managing conservator. *See id.* § 161.207(a); *In re N.T.*, 474 S.W.3d at 480–81 (citation omitted). Section 161.207(a) provides, "If the court terminates the parent-child relationships with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." *See* Tex. Fam. Code Ann. § 161.207(a). Here, Mother's parental rights to Ivy were terminated, as such, we

76

cannot conclude, as to Mother, that the trial court abused its discretion by appointing the Department as the managing conservator. *See In re J.A.J.*, 243 S.W.3d at 616; *In re N.T.*, 474 S.W.3d at 480–81.

We overrule Mother's fifth issue.

In her final issue, Mother argues that the trial court abused its discretion when it failed to declare a mistrial or strike Horton's testimony after Horton and a juror had improper communication. According to Mother, this communication risked the influence of the juror's perception of Horton's credibility and neutrality, and though the juror was excused, this did not cure the harm.

A trial court's denial of a motion for mistrial is reviewed for an abuse of discretion. *Primrose Operating Co. v. Jones*, 102 S.W.3d 188, 193 (Tex. App.—Amarillo 2003, pet. denied). We likewise consider a trial court's denial of a motion for a new trial based on jury misconduct under an abuse-of-discretion standard. *See Agnew v. Tex. Mexican Ry. Co.*, No. 04-96-00814-CV, 1997 WL 360645, at *8 (Tex. App.—San Antonio June 30, 1997, writ denied) (mem. op). To warrant a new trial for jury misconduct, the movant must establish that (1) the misconduct occurred, (2) it was material, and (3) it probably caused injury. *See Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 372 (Tex. 2000). It is the movant's burden to demonstrate all three elements before a new trial can be granted. *In re Whataburger Rests. LP*, 429 S.W.3d 597, 599 (Tex. 2014) (citation omitted). Whether misconduct occurred

and caused injury is a question of fact. *Id.* Injury is not probable when the evidence shows the jury would likely have rendered the same verdict without misconduct. *Id.*

In this case, the allegation of juror misconduct arose during a recess that occurred at the conclusion of trial testimony but before closing arguments. The trial court held a hearing and questioned Horton, the case worker, and the Juror, to determine whether juror misconduct had occurred. Horton testified that her comments with the Juror were about lunch, and that the Juror said that the jury room was loud and she thanked Horton for her services. The Juror testified and recalled Horton complimenting her bracelets. The Juror denied discussing her conversation with Horton or the case with any jurors.

After the testimony, the trial judge dismissed the Juror, and Mother's counsel reurged her motion for a mistrial. The trial judge stated that he "did not have a basis to believe that the rest of the jury was tainted in any way by this short conversation between [Horton] and the juror that [has been] excused. So that motion is denied."

The evidence established that Horton and the Juror did not discuss the case, and that the Juror did not discuss her conversation with Horton, the case or the testimony with the jury. Mother presented no evidence that confirmed that the interaction between Horton and the Juror was material and probably caused injury. *See Golden Eagle Archery*, 24 S.W.3d at 372. The trial court, as factfinder, was entitled to credit the witnesses' testimony. *See id.* Because the trial court as the

factfinder determines the weight and credibility of the testimony, we cannot say that the trial court abused its discretion in denying the motion for mistrial. *See id.*

We overrule Mother's sixth issue.

## Conclusion

Having concluded that Father failed to preserve his sufficiency complaints, the evidence was legally and factually sufficient to support the jury's findings as to sections 161.001(b)(1)(D), (E), that terminating Mother's parental rights is in Ivy's best interest, and that it was not an abuse of discretion to appoint the Department as Ivy's managing conservator and deny Mother's motion for mistrial, we affirm the trial court's Order of Termination.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on March 23, 2026
Opinion Delivered April 30, 2026

Before Golemon, C.J., Johnson and Wright, JJ.